## Case No. 5,796.

### In re GREGG.

[1 Hask. 173;[1] 3 N. B. R. 529 (Quarto, 131); 1 Am. Law T. Rep. Bankr. 298.]

District Court, D. Maine. Dec., 1868.

BANKRUPTCY — ASSIGNMENT OF A PERMIT TO CUT TIMBER—ADVANCES MADE TO BANKRUPT.

1. The assignment of a permit to cut timber and a conveyance of the timber by a bankrupt before he filed his petition in bankruptcy, to secure any amount due the assignee of the permit on settlement, create a valid lien upon the timber cut to secure all advances made to the bankrupt by such assignee before the petition in bankruptcy was filed: and such assignee is entitled to recover from the proceeds of the sale thereof such advances, together with all sums paid to extin-

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

guish prior statute liens thereon, and the cost of driving the timber to market.

2. Advances made to the bankrupt by such assignee, on the faith of such assignment and conveyance, after the bankrupt has filed his petition in bankruptcy, but of which the assignee was ignorant, are not secured upon the timber, and do not create a lien thereon.

3. If such assignee of the permit agrees to assign his security to another, who thereupon before the assignment is made, advances funds to drive the logs to market, the latter is entitled in equity to be subrogated to the rights of the former, and in addition thereto, has a lien upon the logs for the advances so made by him, upon the ground that equity considers done that which is agreed to be done.

[Cited in Brown v. Brabb, 67 Mich. 28, 34 N. W. 408.]

4. The purchaser of land by deed will take a fee as against the assignee of a bankrupt, who held before his bankruptcy a bond for a deed of the same from the purchaser's grantor, the conditions of which the bankrupt had violated, unless the owner of the land, who gave the bond, had so conducted and dealt with the bankrupt as to have waived the breach of the bond.

5. A bankrupt, holding a bond for a deed of land, the condition of which he had broken, acquired no title to timber he had cut thereon without the consent of the owner of the land, and none passed to his assignee in bankruptcy.

[Cited in Re Lake, Case No. 7,992; Taylor v. Irwin, 20 Fed. 617.]

In bankruptcy. Petition by Hayford and Pearson to charge funds, received by the assignee from the sale by him of certain logs as the property of the bankrupt [Thomas B. Gregg], with a lien that attached to them before their sale. The cause was heard upon the report of Mr. Register Hamlin, to whom the same had been referred.

John A. Peters and Franklin A. Wilson, for Hayford.

James S. Rowe and John F. Appleton, for Pearson.

W. C. Crosby, assignee, pro se.

FOX, District Judge. In this case, the assignee has disposed of a large quantity of logs, cut by the bankrupt in the winter of 1867–68, under permits from the owners of the tracts of timber land, and questions have arisen as to the amount of certain liens alleged to exist thereon; the whole matter has been referred to Mr. Register Hamlin, and the questions are now presented for decision on his report and the depositions accompanying it. The bankrupt filed in this court his petition to be adjudged a bankrupt on Feb. 29, 1868, and the decree of bankruptcy was entered on the 30th of March last.

On the 5th day of February, 1868, the bankrupt assigned the permits for lumbering to one Hayford, as "security for the payment of any and all sums he might owe him on settlement;" and on the same day Hayford advanced to the bankrupt his two notes of $2,100 each, on five and six months without interest, payable to Gregg, charging them to him on account, together with a commission amounting to $210; the assignment of the permits and the lumber cut under them,

was given as security for these advances; a lien on the timber was created thereby for their payment, and these sums should be paid by the assignee from the proceeds realized by him from the sales of this timber. Hayford is not however, at present, the owner of this claim, having on the fourth day of July, in consideration of $8,402 paid to him by one Pearson, assigned to him all his account against Gregg, together with the two permits, a written agreement to make and accept such an assignment having been entered into between Hayford and Pearson on the 10th day of April.

Under this assignment, Pearson claims to be subrogated, in place of Hayford, to all of Hayford's claims and securities against the bankrupt. It appears, that on the 21st of March Hayford made to the bankrupt a second advance of his notes, three in number, each for $2,075, charging them to him on account, and also a commission of $311.25. These notes were discounted for the bankrupt at the rate of 9¼ per cent. including brokerage. Hayford at the same time advanced to the bankrupt in cash $667.38. After the notes were discounted, the bankrupt paid back from their proceeds to Hayford on the 21st day of March $2,966.73, and this amount was passed by him to the credit of the bankrupt with interest at the rate of eight per cent. for the time the notes had to run, and commissions $148.50. The purpose of this arrangement is not very apparent; there is something inexplicable in this way of lending a party money, furnishing him with the lender's notes to a larger amount than the borrower needed, and his getting them discounted at 9¼ per cent. paying over to the lender the surplus beyond his necessities, which amount is credited to him with interest at eight per cent. only; but the parties testify such was the transaction, and in the view I take of their rights it is not very material to determine upon the propriety of such an arrangement. The report finds that the bankrupt filed his petition in bankruptcy in this court on the 29th of February. Hayford advanced him his notes on the 21st of March subsequently, not knowing of the filing of such petition, and his assignee Pearson claims that Hayford is to be considered in the light of a bona fide purchaser without notice, making the advances in good faith, ignorant of any proceedings in bankruptcy, and relying on the security which he held through the permits which had been assigned to him Feb. 5, and which were to be "held by him as security for the payment of any and all sums Gregg might owe him on settlement."

The 14th section of the bankrupt act [of 1867 (14 Stat. 522)] provides, "that as soon as the assignee is appointed, etc., the judge, etc., * * * or the register, shall by an instrument under his hand assign and convey to the assignee, all the estate, real and personal of the bankrupt, with all his deeds

books and papers relating thereto, and such assignment shall relate back to the commencement of said proceedings in bankruptcy, and thereupon, by operation of law, the title to all such property and estate, both real and personal, shall vest in said assignee." The 38th section of the same act provides, "that the filing of a petition for adjudication in bankruptcy, shall be deemed and taken to be the commencement of proceedings in bankruptcy under this act." Form No. 18, as prepared by the justices of the supreme court for the assignment of the bankrupt's effects, in terms conveys and assigns to the assignee all the estate, real and personal, of the bankrupt, including all the property of whatever kind, of which he was possessed, or in which he was interested on the day of the filing of the petition.

Under the present act, I hold, that from the moment the petition in bankruptcy was filed, the bankrupt had lost all power of disposal of any portion of his property, and any subsequent conveyance or transfer by him was a nullity, and absolutely void as against the assignee. The assignment was subsequently executed by the register, but its effect must depend entirely on the language of the act, and it is expressly enacted that the assignment when made, shall relate back to the commencement of the proceeding, which is declared to be the filing of the petition. The register, "by such assignment, merely executes a power devolved by law upon him; he conveyed no interest of his own; the property which passes by it is transferred by force of the statute; and therefore the legal effect of such transfer depends little upon the terms of the assignment, either as to the property transferred, or the time at which it shall take effect; but the legal effect and operation of the assignment in these respects, must depend upon the provisions of the statute. It is purely a statute title, under which an assignee claims the goods or choses in action of the insolvent, and to the statute he must look for the nature and extent of that title." Clarke v. Minot, 4 Metc. [Mass.] 348.

An entirely different time for the devesting of the property of the bankrupt is found in the former bankrupt act; by the 3d section of Act 1841, it was provided that from the time of the decree of bankruptcy, the property shall be deemed to be devested out of such bankrupt, without any act or conveyance whatever. Under the English bankrupt act, it has been frequently decided that when an assignment is made under a good commission of bankruptcy, it relates back to the act of bankruptcy, and avoids all mesne conveyances, excepting when made bona fide, more than two months before the date and issuing of the commission. The law on this point is clearly stated by Bosanquet, J., in his opinion in Balme v. Hutton, 9 Bing. 471. He says, "It is not to be disputed, with respect to persons in general, that after an assignment by the commissioners, all property of the bankrupt is liable to be treated and dealt with, not merely as actually being, but as having been, from the time of the act of bankruptcy, the property of the assignees; and that persons who possess themselves of such property, or dispose of such property to others, are liable to be sued for a tortious conversion in actions of trover. This liability to answer in an action of tort to the assignees does not depend upon any actual or presumed knowledge on the part of the defendant of the existence of an act of bankruptcy. The act of bankruptcy subjects the property of a trader to the right of his assignees in the event of a commission, and when the assignment has been executed, the title of the assignees is completed by relation from the date of the act of bankruptcy. The effect of this relation may sometimes produce hardships to individuals, who may have purchased or disposed of property with perfect honesty and good faith. But the necessity of adopting a retrospective measure for the prevention of fraud has been thought sufficiently to counterbalance the evil of such occasional hardship. Even those persons who purchase goods, sold by the sheriff under an execution against a trader, are liable to be sued in trover for the value of the goods, by assignees claiming under a commission subsequently issued, if an act of bankruptcy appears to have been committed by the trader before the sale. A limit, however, has been set to this retrospective effect of the bankrupt law by provisions introduced into the latter statutes, by which parties who act bona fide and without notice of an act of bankruptcy are protected, unless a commission shall have issued within a certain time." This principle has even been applied to a transfer of negotiable paper by a bankrupt, and the title of an innocent holder of a bill of exchange by transfer from a bankrupt has been made to yield to that of the assignee. Willis v. Freeman, 12 East, 656.

In Kynaston v. Crouch, 14 Mees. & W. 266, a man committed a secret act of bankruptcy by leaving his house, but before he left, desired the defendant, his foreman, who had been accustomed to manage his business, to carry it on in his absence; the defendant accordingly did so, and received several sums of money for debts due the bankrupt, and for goods sold after the act of bankruptcy. He also made several bona fide payments, some to creditors of the bankrupt for expenses of housekeeping, and retained some for wages due himself; the moneys were used and the payments made without notice of any act of bankruptcy. An act for money had and received was brought by the assignees, and defendant pleaded never indebted and set off. It was decided that the defendant was liable to the assignees for all the money received by him after the act of bankruptcy, and that he was

not entitled to set off any of the payments made by him.

The case of Copland v. Stein, 8 Durn. & E. [8 Term R.] 199, is not unlike the present case. In that case, a trader, after a secret act of bankruptcy, assigned goods to a factor, who agreed to advance money thereon, and accordingly accepted and paid bills drawn on him by the trader. A commission of bankruptcy afterwards issued against the trader on such prior act of bankruptcy, after which the factor sold the goods and received the money, and it was held that he was answerable to the assignees for the value of the goods. Ld. Kenyon said: "A decision in favor of the defendants would be contrary to all the bankrupt laws, and to the cases that have been determined upon them, on the ground of relation back to the act of bankruptcy. * * * The doctrine of relation obtains universally through all the bankrupt laws, except in the cases that are particularly excepted, and this case does not come within either of those exceptions. The argument of the defendant goes the length of asserting, that if a bankrupt, after a secret act of bankruptcy, sell or mortgage his estate, such sale or mortgage will be valid. It is true that if no commission be taken out for five years after the act of bankruptcy committed, such sale would be good; but in no other case can such a sale be protected. In the present case the goods were delivered in Oct., 1796, but now it appears that the bankrupt, by having committed a secret act of bankruptcy two months before, was incapacitated from disposing of these goods to the prejudice of his creditors at large. This is a hard case on the part of the defendants, but we are compelled to decide against them by positive law, and can only say ita lex scripta est."

The case under the English bankrupt act is certainly much harder for a party dealing with the bankrupt than under the act of congress. By the English law, the acts of bankruptcy may be secret, of such a nature as it would be impossible for the party to be advised of. No means exist by which the utmost diligence could protect a party, and give him knowledge of such act on the part of the bankrupt; whilst by our bankrupt act, the records of the court in bankruptcy are always open for inspection, and it is not until the petition is filed in court, that the statute declares "that the property shall be devested;" the fact is therefore within the means of knowledge of any one dealing with another, if he will take the trouble to consult the records of the court, the 38th section declaring, that the docket shall be open to public inspection. It is a record of the same public nature as the registry of deeds. The record of a deed is legal notice of the conveyance to all parties interested, and in the same manner congress has enacted that the filing of the petition in court shall be conclusive upon the rights of all parties, and from that time the bankrupt shall have no control or disposition of the property formerly belonging to him. As remarked by Ch. J. Shaw in Clarke v. Minot, 4 Metc. [Mass.] 349: "It seems to have been the obvious policy of the statute, to fix some precise point of time, at which the whole property and effects of the debtor shall be deemed to have passed from him, and vested in the assignees."

I am of opinion therefore, that Hayford did not acquire any legal right to hold the permits and timber cut by either of them, as security for the cash and notes advanced by him to the bankrupt on the 21st of March, as the petition in bankruptcy was filed Feb. 29th, and Hayford must be deemed in law to have had constructive notice of its filing, and of its effect under the operation of the bankrupt law. It is claimed that if Hayford acquired no legal right to hold the permits and timber as security for his advances of March 21st, still he has a right in equity to look to them as security for such advances, on the ground that the assignee takes only the property of the bankrupt, subject to like equities with the bankrupt. It is true that such is the title of the assignee. Mr. Justice Story, in Mitchell v. Winslow [Case No. 9,673], has examined this matter with his usual care and learning, and most clearly vindicates and enforces the doctrine that assignees, except in cases of fraud, are affected with all the equities which would affect the bankrupt if he were asserting his rights and interests in the property.

But that principle can only operate on the title as it stood when the property passed from the bankrupt to the assignee, and not to any rights attempted to be obtained subsequently. By the laws of Maine, a lien is given for personal services in cutting, hauling, or driving logs or lumber, which shall take precedence of all other claims, except liens reserved to the states of Maine and Massachusetts. Such liens would override the rights acquired by Hayford by force of the assignment of the permits, so far as such liens existed in full force at the time of filing the petition. I am of opinion that Hayford, by virtue of the interest he held in the lumber under the permits, had a right to advance money for the discharge of such liens, and that the amount, actually paid and applied in discharge of them, he may claim out of the proceeds of the lumber as against the assignee. The case is similar to a second mortgageor, who should pay off a prior mortgage, or discharge a tax which was a lien on the mortgaged estate. As against an assignee in bankruptcy, the amount so paid in protection of his title to an estate would be an equitable claim on the estate, and it would pass to the assignee burdened with such equities.

It is claimed, that a portion of the amount advanced by Hayford was applied to getting the logs to market, and that thereby their value has been increased to that extent;

that at the commencement of the proceedings in bankruptcy, the logs were in the streams, or on the banks where cut, and that it was necessary that they should be driven to market; that a large portion of the advances were applied to this purpose, and that it is inequitable and unjust for the assignee to take possession of the logs at the boom, where they were worth a much larger sum than they were when on the banks and in the streams, this increase in value being occasioned by the expenditure of the money so furnished by Hayford. Considering Hayford's relation to the property by the transfer of the permits, and the peculiar character of the property itself, its necessary diminution in value by being allowed to remain where it was, and that some expenditures were actually necessary for preserving the lumber, and that without doubt the estate of the bankrupt has derived a substantial benefit from the expenditure, I feel justified in deciding, that Hayford is entitled to an equitable lien on the timber for such sum as was actually, fairly and judiciously expended in the care and driving of the timber to the boom after Feb. 5th. Pearson, having on the 10th of April agreed with Hayford that he would pay his demands against Gregg on or before July 5th, and that the permits should be assigned to him, on the 11th of April advanced to Gregg by his note $1,565, and on the 13th of May $1,500 more.

These advances were made by Pearson to Gregg, that he might pay his men, and for driving the logs. At this time, Pearson had no legal interest in the timber, the permits not having been assigned to him, but as he had agreed previously to take the permits and pay Hayford his claim, and Hayford had agreed to assign him the permits, adopting the rule that what is agreed to be done may in equity be considered as done, he, Pearson, may be considered as holding the permits, and his advances will stand on the same grounds, and in like condition with those made by Hayford. Sixty-three dollars were paid by Pearson to Blake for boots purchased by Gregg. From the evidence reported, I do not consider this to have been a lien claim; it should not be allowed.

[The case, as presented in the report, does not state with sufficient exactness the amount of lien claims discharged from the sums advanced by Hayford and Pearson; nor the amount actually paid, from the sums advanced by them, for driving the logs to market, and must be recommitted to the register for a more full and detailed report on these points; the burden being on Pearson to establish such payment to the satisfaction of the register].[2]

In addition to the timber cut under the permits, the bankrupt, the same winter, cut a quantity of logs from land in the town of Amity. The legal title to this land was in James White, who in Oct., 1863, made a contract with the bankrupt and one Brown to sell them 1,800 acres of the land, they giving him four notes of $675 each, payable in one, two, three, and four years, with interest annually. Oct. 23, 1864, the first note was paid, and $362.15 was paid on the second note. At the time the notes were given, White gave the signers a bond to convey the land to them on payment of these notes according to their terms. In the winter of 1867-68, Gregg having acquired all of Brown's interest, went onto the land and cut a quantity of logs, which were afterwards claimed by White as his property, and he had them scaled and marked. June 18th White met Gregg and told him he wished the money due on the notes, and Gregg replied, he had nothing to pay with; the same evening Hayford came to White and inquired about his claim on the logs, and he told him he considered them his, as they had been cut without his permission. Hayford informed him he had been furnishing supplies to Gregg, and that he wanted to secure himself. After some conversation, White proposed to give Hayford a deed of the land, and relinquish his claim on the logs for the sum of $2,300, which was about $50 more than the amount due on Gregg and Brown's notes, and the next day the proposition was accepted by Hayford, and the papers executed, and Hayford subsequently sold the logs for $3,109.

The assignee claims that this amount, after deducting the $2,300 paid by Hayford to White, should be applied in reduction of his claim against Gregg, and that before Pearson as Hayford's assignee can insist on payment of the balance of Hayford's claim, he must procure from Hayford a conveyance of the interest he acquired in the Amity lands by virtue of White's deeds.

Whether this claim of the assignee is valid or not, I think, depends on the question, whether as between White and Gregg the latter had any right to the Amity lands which he could enforce against White. The terms of the bond had not been complied with by Gregg and Brown; there was a large amount of the purchase money which was due and unpaid, and had so remained for years. It should appear that White had so conducted and dealt with Gregg, that he had waived the breach, or else Gregg had no interest in the tract or timber that he had cut therefrom.

[2][The testimony on this point is not as full as could be desired, or as can probably be obtained. White's deposition does not meet this question of waiver, although he does say he called for payment of the notes in June, 1868. I shall allow either party to take further testimony on this point, and will reserve my opinion until the matter is again presented].

---

[2] [From 3 N. B. R. 529 (Quarto, 131).]

[2] [From 3 N. B. R. 529 (Quarto, 131).]

[Ordered: That the report of the Register in this cause be recommitted to him, with directions to ascertain and report: 1st. The lien claims on the timber cut under the permits, which were discharged by the sums advanced to Gregg by Pearson, or by the notes and cash advanced by Hayford, March 21, 1868, stating each of said claims, its nature, amount, and when paid and to whom. 2d. The amount paid from such advances after February 5th, 1868, for getting the logs to market, and to whom paid, and when; and whether such payments were judiciously made, and the value of the logs thereby increased to the amount so expended. 3d. The Register will take such further testimony as either party may request, touching the Amity lands, and Gregg's interest therein, and especially touching any waiver by White of the breach by Gregg and Brown of the condition of the bond given by White for the conveyance of said lands.][2]

